**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

**Civil Action No. 12-cv-01761-MSK-CBS**

**DANNIE FAIL;
SCOTT BUCHHOLZ;
CHRISTIAN ANDERSONN;
JOHN ZONTA;
STACY TRUAX;
TIMOTHY MELSON;
SCOTT PHILBRICK; and
JEDADIAH ZILLMER,**

       **Plaintiffs,**

**v.**

**USA,**

       **Defendant.**

_____

**OPINION AND ORDER AFFIMING, IN PART, AND VACATING, IN PART, AGENCY
ACTION**

_____

       **THIS MATTER** comes before the Court pursuant to the Plaintiffs' Motion for Summary

Judgment (**# 30**), the Government's response (**# 33**), and the Plaintiffs' reply (**# 38**); and the

Government's Motion for Summary Judgment (**# 34**), the Plaintiffs' response (**# 38**), and the

Government's reply (**# 40**).

## <u>FACTS</u>

       There is a common factual background underlying the Plaintiffs' claims in this case.  To

the extent necessary, these facts will be supplemented as part of the analysis.

Each Plaintiff has served or currently serves in the United States Army.  As a member of an armed service, each Plaintiff is entitled to obtain insurance under the Servicemembers' Group Life Insurance ("SGLI") program.  38 U.S.C. § 1965 *et seq.*  In 2005, Congress created an add-on to the SGLI program, providing monetary benefits for service members who experience permanent or temporary disabilities as a result of suffering traumatic injuries (whether sustained on- or off-duty).  38 U.S.C. § 1980A.  This coverage, known as "TSGLI,"  applies when a service member has suffered any of several statutorily-defined "qualifying loss[es]" due to a traumatic injury.  38 U.S.C § 1980A(b)(1).  Qualifying losses include the temporary or permanent inability to perform specified "activities of daily living" ("ADLs").  38 U.S.C. § 1980A(b)(2)(D).  ADLs include bathing, dressing, and transferring into and out of beds and chairs, among others.  *Id.*

As addressed in greater detail below, each Plaintiff applied for TSGLI benefits between 2009 and 2011, claiming benefits due to an inability to perform ADLs for a certain period of time.[1]  Two Plaintiffs, Mr. Philbrick and Mr. Zonta, had their claims partially approved by the Army,[2] each receiving an award of $50,000, although they had claimed an entitlement to greater benefits;  the applications of the other Plaintiffs were denied.

The Plaintiffs commenced this suit pursuant to 38 U.S.C. § 1975, which provides that federal District Courts possess jurisdiction over "any civil action or claim against the United

---

[1]     The Court is aware of other pending actions in the District of Colorado asserting similar claims.  Several have been consolidated into *Stringer v. U.S.A*., D.C. Colo. Civ. Case No. 11-cv-02584-RPM.

[2]     The TSGLI statute confers authority over benefit claims to the Secretary of Veteran's Affairs, but the Secretary has delegated that authority to the heads of each individual branch of service.  38 C.F.R. § 9.20(g).

States founded upon" the TSGLI statute.  The Complaint (**# 1**) in this action nominally asserts a claim for "breach of contract," but the substantive allegations of the Complaint allege that the Army's determinations are "arbitrary, unsupported by its own guidelines, and contrary to law." It contends that the Army failed to pay benefits as required by the TSGLI program, failed to identify the reasons for its denials, and "add[ed] additional unauthorized criteria" to the Plaintiffs' claims.[3]

The Government has filed the Administrative Record pertinent to each of the Plaintiffs' applications (**# 15-23**).  The Plaintiffs have moved for partial summary judgment (**# 30**), arguing that: (i) the Court is not limited to review of the Administrative Record; (ii)  that the Court should permit the Plaintiffs to engage in additional discovery, and (iii) Plaintiffs are entitled to summary judgment in their favor based on the Government's "across-the-board summary denial of ADL-related benefits" and "the lack of substance in those denials."  The Government has also moved for summary judgment (**# 34**), arguing: (i) that review of each denial decision should be limited to the Administrative Record pertinent to such decision; (ii) that the Government properly denied (in whole or in part) each of the Plaintiffs' claims; and (iii) that the Government properly identified the reasons for each denial.

---

[3]     The instant briefing mentions, but does not materially elaborate on, issues with additional practices not mentioned in the Complaint, including the Army improperly considering "adaptive behavior [that can] accomplish" ADLs and failing to notify claimants of their rights to pursue judicial remedies.  As discussed herein, it does not appear that those issues are implicated by any of the Plaintiffs' claims here.

## ANALYSIS

### A.  Standard of review

The parties agree that 38 U.S.C. § 1975 confers jurisdiction on this Court to review decisions with regard to TSGLI claims.  Unfortunately, no statute or regulation offers an explication of the standard of review that the Court should apply.

Ordinarily when a federal statute creates a right to judicial review of an agency decision, but does not set forth the standard of review to be used in conducting such a review,  the Court is to apply the familiar "arbitrary and capricious" review dictated by the Administrative Procedures Act ("APA") applies. *See Franklin Savings Assn. v. Director, Office of Thrift Supervision*, 934 F.2d 1127, 1137, 1141 (10th Cir. 1991).  This is not what the Plaintiffs seek, however.  Although they invoke this Court's jurisdiction under 38 U.S.C. § 1975, they contend that an APA-style review of the Army's determinations is not proper.  They make two arguments.

First, they argue that APA review is not proper because in creating TSGLI program, Congress did not require the exhaustion of administrative remedies as a predicate to suit. Assuming, without necessarily finding, that the Plaintiffs are correct that exhaustion of administrative appeals is not required,[4] the Plaintiffs have not offered (and the Court has not found) any statutory or case authority for the proposition that APA review of governmental agency decisions is appropriate only where the agency requires pre-suit exhaustion of administrative remedies.  The Plaintiffs rely on *Darby v. Cisneros*, 509 U.S. 137, 153-54 (1993) for such proposition, but its holding is exactly to the contrary - exhaustion of administrative remedies is not a precondition to APA review.  In *Darby*, the Supreme Court explained that

---

[4]     *See e.g.* 38 C.F.R. § 9.20(i)(3) (describing an administrative appeal process, but noting that "nothing [in that process] precludes a member from pursuing [judicial] remedies")

exhaustion of administrative remedies is only required when a statute or regulation compels it.

*Id.* at 145.  *Darby* notes that an agency can offer "optional appeals" to aggrieved claimants

without destroying the finality of the underlying decision (unless the claimant invokes that

appeal procedure before commencing suit). 509 U.S. at 147.  Here,  the Plaintiffs either did not

pursue, or completely exhausted, the optional administrative appeal.  Thus, the Army's denials of

their claims are final for purposes of review under the APA.

The Plaintiffs second argument appears to be built upon the first.  Plaintiffs argue that the

denials of their TSGLI applications are not "final" decisions.  Admittedly, the precise reasoning

for this argument is not clear to the Court.[5]  *Darby* explains that an agency action is "final" if

"the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual,

concrete injury."  509 U.S. at 144 .  Here, the Army made a final determination on each of the

Plaintiffs' TSGLI claims, denying them in whole or in part.  There can be little dispute that the

denial of benefits constitutes a "definitive position" by the Army on the claimant's application,

and that such a decision inflicts "an actual, concrete injury" on the claimant, thus rendering the

decision final for purposes of APA review.

Under the APA, the Court must affirm a governmental agency decision unless it was

unsupported by substantial evidence, or was made in an arbitrary or capricious manner, the result

---

[5] The Plaintiffs correctly cite to *Darby* for the proposition that "a person aggrieved by an agency action can seek judicial review [under the APA] without exhausting an administrative appeal, unless the agency's regulations provide that the administrative appeal must be taken." Then the Plaintiffs state that "by extension," *Darby* teaches that when exhaustion is not required, review must follow the APA.  For this proposition they refer to 5 U.S.C. § 704(c), which provides that judicial review may be had of a "final agency action" unless the agency "otherwise requires by rule and provides that the action meanwhile is inoperative [during] an appeal to superior agency authority."  From this the Plaintiffs' ultimately conclude that "here, there is no 'final agency action' and thus the APA does not apply."

of an abuse of discretion, or otherwise not in accordance with the law.  5 U.S.C. § 706(2).  The

agency's decision is subject to a presumption of regularity, although that presumption does not

shield the agency from the Court's own in-depth review of the contested issues. *Olenhouse v.*

*Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994).  The agency's factual findings are

reviewed under a "substantial evidence" standard, the same standard that would warrant a court

denying a request for a directed verdict on a factual question at trial.  *Id.* at 1575.   The Court

examines whether the agency examined the relevant data and articulated a rational connection

between the facts found and the decision made. The decision can be set aside if the agency

"relied on factors which Congress has not intended for it to consider, entirely failed to consider

an important aspect of the problem, offered an explanation for its decision that runs counter to

the evidence before [it], or is so implausible that it could not be ascribed to a difference in view

or the product of agency expertise." *Id.* at 1574.

### B.  Plaintiffs' entitlement to discovery

The Plaintiffs argue that they should be entitled to engage in further discovery as to

various matters and to supplement the record on each of their claims for benefits.  The Plaintiffs'

motion and response brief do not clearly identify any particular material they seek to discover or

what is necessary to complete the administrative record.  They imply that "the record fails to

disclose the factors considered by the agency," that they need unspecified "background

information," and they wish to obtain "the basis for [the] standard and interpretation" applied to

the claims by the Army.  Similarly, they mention the need to "peek behind the curtain' to

investigate that which seems to be "undocumented and unexplained" decisions.  They

acknowledge that they have had the opportunity to conduct a Rule 30(b)(6) deposition of a representative for the Army, but do not suggest what specific further information is necessary.

The 10th Circuit explained in *Franklin Savings* that "a reviewing court may go outside the administrative record only for limited purposes," such as "where the administrative record fails to disclose the factors considered by the agency," or "where necessary . . . for determining whether the agency considered all relevant factors including evidence contrary to the agency's position," or where necessary to explain technical terms or complex subject matter.  934 F.2d at 1137.  The Plaintiffs generally suggest that some of these circumstances are present, but do not elaborate in any particular respect and never specifically identify the particular evidence they propose should be included in the record.  For the reasons discussed below, the Court finds that the record sufficiently identifies the standards the Army used, the information that it relied upon in making decisions on the Plaintiffs' applications, and the reasons for its conclusions.  Thus, in the absence of an apparent deficiency in the administrative record or for some other pertinent purpose, the Court finds no reason to permit further discovery or supplementation of the record.

### C.  Merits of each Plaintiff's claim

The Government seeks summary judgment on each of the Plaintiff's claims, arguing that the decision to deny (or, in two instances, to partially grant and partially deny) TSGLI benefits complied with the applicable standards and is supported by substantial evidence in the record. Although the Plaintiffs argue that such a determination is "premature," the full administrative record for each claim is before the Court and the merits of each Plaintiff's claim are ripe for review.

1. <u>General standards</u>

Pursuant to 38 U.S.C. § 1980A(a) and (b), a service member is entitled to TSGLI benefits if he or she sustained a "traumatic injury" after December 2005 and the injury caused one of the statutorily-defined "qualifying losses."  A "qualifying loss" includes the permanent loss of certain senses, the loss of functionality of extremities, and, as particularly relevant here, "the inability to carry out the activities of daily living resulting from traumatic injury to the brain." 38 U.S.C. § 1980A(b)(1)(H).  Although the statutory language limits a "qualifying loss" involving ADLs to those arising from traumatic brain injuries, the statute permits the Secretary to designate additional qualifying losses that will be covered.  38 U.S.C. § 1980A(b)(1).  The Secretary has done so via the implementing regulations, supplying two separate schedules of benefits, one which applies to "traumatic brain injury resulting in ability to perform at least two activities of daily living," 38 C.F.R. § 9.20(f)(17), and one which applies to "traumatic injury, other than traumatic brain injury, resulting in inability to perform at least two activities of daily living."  38 C.F.R. § 9.20(f)(20).  Thus, the Secretary has broadened the scope of TSGLI coverage to include any injury – involving the brain or not – that prevents a service member from performing two or more ADLs.  The Secretary has further prescribed that benefits will only become available after a service member has experienced at least 15 consecutive days of ADL loss (if due to a traumatic brain injury) or 30 consecutive days of ADL loss (if due to something other than a traumatic brain injury).  38 C.F.R. § 9.20(f)(17), (20).[6]

---

[6]     Benefit amounts increase if the service member's inability to perform ADLs extends to 30, 60, and 90 consecutive days (for traumatic brain injuries) or 60, 90, and 120 consecutive days (for injuries other than traumatic brain injuries).

The phrase "inability to carry out the activities of daily living" is further defined by statute as "the inability to independently perform two or more of the following six functions: bathing, continence, dressing, eating, toileting, [and] transferring."  38 U.S.C. § 1980A(b)(2)(D)(i)-(vi). As noted earlier, the statute provides that "the Secretary [of Veteran's Affairs] may prescribe, by regulation, conditions under which coverage otherwise provided under [the statute] is excluded."  38 U.S.C. § 1980A(b)(3).  By published regulation, the Secretary has clarified the statutory term "transferring" to mean "transferring in or out of a bed or chair with or without equipment."  38 C.F.R. § 9.20(e)(6)(vi)(F).

The statutory language references a service member's "inability to independently perform" ADLs.  38 U.S.C. § 1980A(b)(2)(D).  Neither the statute nor regulations elaborate on the meaning of the term "independently," but both sides have pointed to a TSGLI Procedural Guide, which indicates that the Army interprets that term to mean that that service member is unable to perform the ADL when he or she requires physical assistance by another person, "stand-by assistance" from another person available within arm's reach, or "verbal assistance" in the form of reminders or instructions from someone else in order to perform the activity.   By contrast, if the service member is able to perform the activity through the use of "accommodating equipment" (*i.e.* "a cane, walker, commode, etc."), without requiring human assistance, then the service member is considered to be capable of performing the activity "independently."

The Plaintiffs argue that there is a "lack of any meaningful procedural review" of such matters.  It supplies the deposition of Captain James Addis, the Army's Rule 30(b)(6) designee, whom the Plaintiffs were granted leave to depose.  Captain Addis is the Officer In Charge for the TSGLI program.  He testified regarding the structure of the six-member office that reviews

TSGLI claims: there is a single officer responsible for intake; there are several "analysts" or "action officers" that conduct initial reviews of applications and make a recommendation for disposition of the claim; there is a "lead analyst" (or "quality review senior analyst") who reviews the analysts' recommendations, and Captain Addis himself, who also reviews the recommendations before issuing the Army's final determination.  In addition, the staff includes an officer designated to review appeals of determinations.  Analysts are trained in the provisions of the statute and in the use of a Procedural Guide that governs the claim review process.  They are given personal training regarding the review of claim forms and the information they are trained to look for.  In addition, they receive weekly training teleconferences (on unspecified topics) with Veterans Administration officials.

The Plaintiffs' complaint about the sufficiency of the Army's procedural review of claims seems to be premised largely on the asserted fact that the action officers reviewing claims are not required to have medical or insurance claims handling experience. Captain Addis appears to concede as much, initially agreeing that action officers were not necessarily required to have medical or insurance claims handling experience, although he subsequently clarified that statement to indicate that he had "not read the [job] announcements" and "can't say for sure" what particular skills are required of action officers.  Assuming, without necessarily finding, that the Plaintiffs are correct in the assertion that action officers are not required to have particular medical or claims handling experience, the Court nevertheless finds that the Plaintiffs have not cited to authority that permits this Court, in an APA-style review, to poke its head into individual cubicles and evaluate a decision based on the qualifications of the action officer involved in considering it.  Although the Court recognizes that the deference to be afforded to an agency's

decision necessarily scales based on the complexity and technical nature of the dispute, such that the Court's deference to the agency is at its highest when the determination involves "the agency's particular technical experience," *see Marsh v. Oregon Natl. Resources Council*, 490 U.S. 360, 376-77 (1989), the Court is aware of no authority that conditions that level of deference on the qualifications of individual employees involved in making the decision.

In any event, the question of the action officers' experience or training is largely irrelevant. The record reflects that it is Captain Addis himself, not the action officers, that makes the final determination of a claimant's eligibility. Thus, it is Captain Addis' qualifications and actions that are relevant, not those of an action officer who may have handled the case initially. *See e.g. Eagle-Picher Industries, Inc. v. U.S. E.P.A.*, 822 F.2d 132, 147-48 (D.C. Cir. 1987) (rejecting APA attack on actions of staffer who performed initial "scoring" of application, as "[r]egardless of input received from Agency staff, the decision to list Whitewood Creek was for the Administrator, who bears full legal and personal accountability" for that decision). Here, the record reflects that Captain Addis has significant medical experience, having worked as a nurse and as a nurse case manager. Moreover, there is some significance in the fact that Captain Addis and his team are devoted exclusively to the full-time task of reviewing TSGLI claims (rather than determining such claims as only an occasional part of a broader job), and that the centralized review process ensures that eligibility determinations be made reliably across the entire Army. *Compare Muratore v. U.S. Ofc. of Personnel Mgmt.*, 222 F.3d 918, 922-23 (11th Cir. 2000) (acknowledging Office of Personnel Management staff's particular expertise in adjudicating appeals of federal employee health benefit claims, as that office "negotiates the contracts at issue[,] routinely interprets plans to determine an insurance carrier's liability[, and]

has the ability to take a broad, national view when it interprets plans which services the function of ensuring consistent, nationwide application"); *Weight Loss Healthcare Ctrs. of America, Inc. v. Ofc. of Personnel Mgmt.*, 655 F.3d 1202, 1205 (10th Cir. 2011).  Ultimately, while it might certainly be preferable for the Army to hire action officers with extensive medical training or claims handling experience, the Court cannot say that the actual staffing and structure of the Army's review process warrants depriving the Army's eligibility determinations of deference, so long as they are not otherwise arbitrary or capricious and are supported by substantial evidence.

With these standards in mind, the Court turns to the particulars of each Plaintiff's application.

### 2. Mr. Fail

Mr. Fail was injured in a motor vehicle accident on November 15, 2008, sustaining injuries to his foot.  He was taken to the Emergency Room and diagnosed with two dislocated toes on his right foot.  Physicians "relocated" the toes into proper position.  Mr. Fail was given a "cam walker"-- a removable boot designed to immobilize his foot -- and crutches, and ordered not to bear weight on his right foot.  Mr. Fail had a follow-up consultation with the podiatry clinic on November 17, 2008.  His examination revealed no swelling of his right foot, but swelling of the two toes and pain when the toes were moved.  He returned again to the clinic on November 23, 2008.  At that time, his records indicate that he was "doing well."  He was told to continue using the cam walker and use crutches to avoid placing weight on the foot, and to take pain medication "as needed."[7]  Notes from the November 23, 2008 visit indicate that he was

---

[7]     Notably, the prescription for pain medication called for him to take one pill every four hours as needed for pain.  A total of 20 pills were prescribed, suggesting that his doctors did not intend for him to continue to require the use of pain pills for more than a few days.

"released w/o limitations" and directed to "follow up as needed in 3 to 4 weeks" at the clinic, "or sooner if there are problems." The record does not disclose any follow-up or subsequent medical treatment of Mr. Fail for this particular injury.

Mr. Fail applied for TSGLI benefits arising from this injury in December 2011. His application was supported by the certification of Terri Burns, a registered nurse.[8] Ms. Burns stated that she had reviewed Mr. Fail's medical records and concluded that "length of disability from this type of injury is normally 4-8 weeks," and that "during this time, Mr. Fails (sic) was . . . unable to dress independently, unable to bathe independently, and unable to transfer independently" for a period of 45 days (*i.e.* from the date of the injury through December 29, 2008). Ms. Burns opined that "due to the nature of Mr. Fails' traumatic right foot injury and immobilization, it is reasonable to state that he would need some assistance with ADLs such as bathing, dressing, and transferring," but Ms. Burns did not elaborate on the type of assistance that would have been required.

---

[8]     A service member makes a claim for TSGLI benefits using a standardized form issued by the Veteran's Administration. That form, identified as SGLV 8600, contains an initial section ("Part A") that the service member completes, providing certain contact details, bank account information (for benefit payments), and certain information about the injury giving rise to the claim. The second portion of the form ("Part B") is a certification that must be completed by a medical professional, that, among other things, identifies the injury, describes the limitations caused by the injury, and indicates whether the professional's knowledge of the relevant facts is based on personal observation and treatment of the service member or whether the professional simply reviewed the service member's medical records.

The Army formally denied Mr. Fail's claim on March 28, 2012,[9] finding that "medical documentation provided does not indicate the member's loss met the TSGLI minimum standard."

The record indicates that the Army chose not to simply defer to Ms. Burns' opinions, and instead, reviewed Mr. Fail's medical records itself to determine whether such records supported the claimed limitations.  This Court cannot say that the Army's decision to do so was inherently arbitrary and capricious, an abuse of discretion, or contrary to law.  Certainly, nothing in the TSGLI statute or the enabling regulations requires that the Army simply accept wholesale the medical provider's conclusions, so the Court cannot say that the Army's refusal to do so is "contrary to law."  Moreover, the Court cannot conclude that the refusal to do so is an abuse of the discretion conferred on the Army.  Unlike a certification completed by a medical professional who actually supplied treatment to the claimant and who is thus a percipient witness as to the nature and extent of the claimant's limitations, a medical professional who completes the certification based solely on a review of the claimant's medical records is offering nothing more than a *post hoc* opinion.  In many circumstances – such as Mr. Fail's – that opinion is rendered long after the claimant has recovered from the injury and is based on nothing more than a review of the very same records that are submitted along with the claimant's application.  In short, the very same records that the certifying medical professional relies entirely upon may be available to the Army as well.

---

[9]     Mr. Fail notes that the Administrative Record does not include a copy of the letter formally denying his claim, but does not appear to dispute that the claim was, in fact, denied for the reasons reflected in the record.  It is unclear what significance, if any, Mr. Fail asserts that the absence of a formal denial letter has.

In such circumstances, the Court cannot say that it is arbitrary and capricious for the Army to examine and evaluate the underlying records itself, rather than relying on the certifying medical profession's interpretation of the same records.  The Plaintiffs argue that the Army is allowing untrained laypeople to make medical determinations that are contrary to the opinion of a medical professional.  Even assuming that the action officers conducting the initial review of claim applications indeed lack medical training (as the Plaintiffs contend), the record reflects that they merely make recommendations to Captain Addison.  It is Captain Addision – who does have medical training and experience – who makes the ultimate determination of whether a claim is granted or denied. Moreover, any action officer may consult with the on-staff appeals officer – a physician – regarding any claim.  Moreover, as noted above, the courts have found that an agency staff's full-time devotion to claims review and the goal of uniform nationwide application of agency standards counsel in favor of granting deference to the agency's expertise in such matters. *Muratore*, 222 F.3d at 922-23; *Weight Loss*, 655 F.3d at 1205.  Thus, the Court cannot say that the Army allowing action officers to evaluate the underlying medical records, rather than simply adopting the opinions of  the certifying medical professional, is inherently arbitrary or unreasonable.

This is not to say that the Army is free to disregard or give minimal deference to the certifying professional's opinions in all circumstances.  There will often be circumstances where some weight, or even considerable weight, should be given to the certifying professional's opinions regarding limitations.  Factors that might inform the question of how much deference should be afforded by the Army to the certifying professional's opinion as to the nature and extent of a claimant's limitations may include: (i) the extent to which the certifying profession is

offering percipient testimony about the claimant's limitations or treatment, or the extent to which the professional is simply interpreting others' medical records; (ii) the extent to which the certifying professional is involved with the ongoing care of the claimant for the same injury or limitations; (iii) the length of time between the injury, the limitations, and the professional's review and certification; (iv) the clarity (or lack thereof) of the underlying medical records; and (v) the complexity of the claimant's injuries and treatment, among many other factors.

Here, Ms. Burns' certification of Mr. Fail's limitations was made long after Mr. Fail's actual injury and was apparently based only on Ms. Burns' own review of Mr. Fail's medical records. She does not, for example, profess to have personally treated Mr. Fail during his recovery from the injury, nor claim to have consulted with him about the actual limitations he experienced. Indeed, she does not even address the particular characteristics of Mr. Fail's own injury; rather, she appears to base her conclusion solely on the more generalized opinion that dislocations of this type "normally" result in disability periods of "4-8 weeks," and that persons with such injuries would typically have unspecified difficulties with ADLs of bathing, dressing, and transferring.

The Army's review of Mr. Fail's medical records those records reasonably led to a conclusion that Ms. Burns' opinion may have been somewhat overstated. Mr. Fail's treating physicians found him to be "doing well" a week after the initial injury, and although he was directed to continue to use crutches and a cam walker for mobility, he was directed to arrange a follow-up appointment three to four weeks (*i.e.* four to five weeks after the accident itself) later, "if needed." The record does not reflect that Mr. Fail ever sought such follow-up care, suggesting that his injury had sufficiently resolved by the end of that three to four-week period.

Although it may be fair to assume that Mr. Fail might have been limited in various ADLs at the initial stages of his recovery, it was not unreasonable for the Army to conclude that any such difficulty in performing those ADLs had largely abated in the latter stages of that recovery. Since the recovery itself took no more than 4-5 weeks from the date of the injury, it was therefore reasonable for the Army to conclude that Mr. Fail's inability to perform any ADLs did not exceed 30 days, and thus, he was not eligible for TSGLI benefits. On this record, the Court cannot say that such a decision was arbitrary or capricious.

### 3. Mr. Buccholz

Mr. Buccholz filed an application for TSGLI benefits on May 15, 2010 based on an initial injury that occurred on December 28, 2005. On that date, he was the passenger in a motor vehicle that was hit by a drunk driver and overturned. That accident caused injuries to Mr. Buccholz's right hip, right knee, right shoulder, and spine. He states that he underwent surgeries on his shoulder on August 29, 2006 and again on January 9, 2009. The medical provider portion of his TSGLI application was certified by Limuel Ferguson, an Orthopedic Physician's Assistant. Mr. Furgeson's certification is dated December 15, 2010, although the record reveals that Mr. Furgeson was also one of Mr. Buccholz's treating providers at the time period at issue.

Mr. Furgeson stated that Mr. Buccholz was unable to independently perform the ADLs of bathing and dressing from the date of the injury through the date of the application (a period of more than 5 years), and that he was unable to transfer "intermittently" since the injury date. With regard to the dressing ADL, Mr. Furgeson stated that Mr. Buccholz was "unable to put a shirt on . . . w/o wife's help after surgery, then again 1 mon. after repeat surgery . . ." As to

bathing, Mr. Furgeson wrote "shoulder surgery from [musc?] injury 2005, again shoulder surgery Jan 09 needed help for 1 month [after?] surgery."

The Army initially denied Mr. Buccholtz's claim. On May 9, 2011, Mr. Buccholz filed a request for reconsideration that explained that "it was not my intent to claim" benefits for so broad a period of time, but rather, "the specific area of coverage that I am appealing is the disapproval of TSGLI benefits for the loss of ADLs for a 30-day period after my first right shoulder surgery . . . on 29 August 2006." In light of this narrowing, the Court turns to Mr. Buccholz's records relating to the August 2006 surgery to ascertain whether they are consistent with Mr. Furgeson's certification.

The August 2006 surgery entailed a right shoulder arthroscopy with lateral debridement and a right open distal clavicle excision. The surgical report indicates that his post-operative treatment plan involved a "sling for comfort [and] range of motion [exercise] as tolerated with progression through physical therapy as tolerated." He was seen in the physical therapy clinic the day after surgery, and records from that visit note "impairments" in the form of pain, decreased range of motion, effesion/swelling, [and] decreased strength and neuromuscular control." He was put on a 4-week physical therapy schedule. He was shown a series of exercises to perform and was told that his goals for the first two weeks of the plan included various range of motion benchmarks, as well as "d/c [presumably "decrease"] sling by wk. 2."

Several subsequent pages in the record are illegible due to a scanning or copying error, but it appears that Mr. Buccholz underwent an additional physical therapy consultation on September 5, 2006. His next treatment was by Mr. Furgeson on September 16, 2006. Notes from that visit stated that Mr. Buccoz's chief complaint was for "[follow-up] after R shoulder

surgery DOS 29 Aug. 06 doing well ran out of pain meds. . . needs percocet." There are additional pages in the record that are again illegible, apparently from a September 22 consultation.  The Court is reluctant to attempt to interpret records for which only a part of the page is legible, although legible fragments of the document seem to indicate that Mr. Buccholz was "still with mild tightness with cross arm activities by pain overall improved" and that he was "progressing well with excellent [range of motion].  Will return to work next [week?]."

The Army formally denied Mr. Buccholz's request for reconsideration on May 31, 2011, finding that he had not shown that his medical records did not adequately support his contention that he had been unable to perform ADLs for 30 consecutive days.

The Court finds this conclusion to be consistent with the evidence in the record.  Notably, Mr. Furgeson's own certification of Mr. Buccholz's limitations is somewhat unclear.  It is clear that Mr. Furgeson's certification was not necessarily addressing the particular limitations that Mr. Buccholz experienced as a direct result of the August 2006 surgery, as Mr. Furgeson's certification indicated that the onset of the limitations was the 2005 accident.  Moreover, Mr. Furgeson did not indicate an ending date for the limitations, checking the box indicating that the limitations were ongoing to the date of the application in 2010, although it is evident that Mr. Buccholz was not contending that his limitations from the August 2006 surgery persisted for so long.  Mr. Furgeson's own comments about the nature and extent of the limitations are themselves ambiguous.  As to the ADL of dressing, Mr. Furgeson appears to indicate that Mr. Buccholz required his wife's assistance in various tasks "after surgery," but it is not clear for how long.  As to the ADL of bathing, Mr. Furgeson's statements appear to reference Mr. Buccholz's injury in 2005 and his surgery in 2009, but make no comment about such a limitation

resulting from his surgery in August 2006.  Finally, his statements concerning the ADL of

transferring admittedly indicate that Mr. Buccholz experienced such limitations only

"intermittently," without any indication that they occurred for a period of 30 consecutive days

(much less 30 consecutive days as a result of his 2006 shoulder surgery).  Thus, even if the Army

generously interpreted the certification to suggest at least 30 continuous days of Mr. Buccholz's

inability to perform the ADL of dressing after the August 2006 surgery, the certification does not

support the conclusion that Mr. Buccholz was unable to perform a second ADL during that same

period.  Thus, Mr. Buccholz's application itself (at least to the extent Mr. Buccholz subsequently

limited it to the August 2006 surgery) was facially insufficient to demonstrate TSGLI eligibility.

Accordingly, the Court affirms the decision to deny benefits to Mr. Buccholz.

### 4. Mr. Andersonn

Mr. Andersonn applied for TSGLI benefits on March 14, 2011, claiming an injury date of

August 19, 2009, when he injured his knee jumping off an obstacle on an obstacle course.

However, Mr. Andersonn's claim involved limitations incurred when he underwent surgery to

repair a torn ACL on the injured knee on April 7, 2010.[10]  Mr. Andersonn's application was

supported by the certification of Shelia Mitchell, a Physician Assistant.  Ms. Mitchell stated that

Mr. Andersonn underwent a left knee chondroplasty and meniscual debridement on that date,

and that as a result, he was unable to perform the ADLS of bathing, dressing, toileting, and

transferring for a period of 60 days thereafter.  Ms. Mitchell indicated that she did not treat Mr.

---

[10]     The Court notes that the record does not necessarily support a conclusion that the need
for the surgery was caused by the August 19, 2009 injury.  Mr. Andersonn had been reporting
knee pain since resuming a physical training regimen in January 2009, had several physical
therapy sessions both before and after the August 19, 2009 injury for that pain.  The Army does
not base the denial of Mr. Andersonn's claim on any lack of causal connection between the
surgery and his claimed injury, and thus, the Court does not consider the matter further.

Andersonn or otherwise observe his incapacity during this time frame and that her certification in 2011 was based solely on a review of his medical records.

Mr. Andersonn's medical record indicates that his first post-surgery treatment was on April 9, 2010.  He reported a pain level of 3 (out of 10) and although he was ambulating on crutches, he was given physical therapy exercises to perform.  He was seen again on April 13, 2010, and was continuing to ambulate on crutches, but with the notation "WBAT" (weight-bearing as tolerated).  The record reflects that he continued regular physical therapy sessions for several weeks thereafter, although it provides only details of exercises performed and no particular commentary about his recovery.  The first clear indication of his progression is a visit note from May 16, 2010.  It reports that Mr. Andersonn had been issued a cane for ambulation and was instructed to wear a knee brace for added stability.  His doctor at that time indicated an intention to "wean [him] from cane," but records from June 17, 2010 indicate that, as of that date, Mr. Andersonn was still attempting to "wean himself from use of the cane."

Mr. Andersonn's record is unusual in the sense that it includes a written statement from his wife, dated November 8, 2010, in which she "outline[s] the care I gave to my husband after the surgery on his knee."  She states that from April 7 to June 7, she gave "maximum help [to him] when getting into or out of bed," "maximum help given when bathing, including supporting [him] in a standing position while showering, and helping to bathe lower extremities," "maximum help given with all lower body dressing needs," etc.  Curiously, neither party's briefing even mentions Mr. Andersonn's wife's statement.

The Army contends that Mr. Andersonn's claim was denied because "at most, the records show that [he] required accommodating equipment," such as crutches, a cane, and a knee brace.

The parties' argument focuses on whether the Army is permitted to interpret the statute to provide that a need to rely upon assistive equipment (rather than human assistance) to complete an ADL is insufficient to qualify for TSGLI benefits, and whether the articulation of that policy as part of the Procedural Guide, rather than via a promulgated regulation, is sufficient.

The Court finds that it need not reach that question, as Mr. Andersonn's wife's statement is enough to permit the conclusion that Mr. Andersonn is qualified for benefits.  This is not a situation where a medical provider has offered a *post hoc* opinion that, in general, patients who undergo a particular procedure will be precluded from performing certain ADLs for a specified period of time.  The Army appears to routinely discount such opinions unless specifically corroborated in the record, and, as discussed above, this Court cannot say that such a practice is necessarily improper.  However, Mr. Andersonn's wife's statement is more than a *post hoc* opinion based on general patterns; it is a statement from a percipient witness about the specific limitations that Mr. Andersonn actually experienced.  Although the statement is somewhat stilted, concuslory, and ambiguous, never quite articulating what the phrase "maximum help" means, it is nevertheless clear and unrebutted evidence that Mr. Andersonn indeed employed human assistance to perform the various ADLs during the 60-day time period set forth in the statement.  The Army either failed to consider this evidence or simply discounted it without explanation, either of which would clearly be arbitrary and capricious action.  Because there is no evidence in the record that disputes Mr. Andersonn's wife's first-hand account of the assistance she provided to him and the duration of that assistance, the Court further finds that the Army's determination that Mr. Andersonn did not satisfy the requirements of TSGLI eligibility during the period of April 7, 2010 to June 7, 2010 was also arbitrary and capricious.

Accordingly, the Court vacates and sets aside the Army's finding with respect to Mr. Andersonn's claim and directs that the Army certify that Mr. Andersonn met the requirements of TSGLI eligibility for the period of April 7, 2010 to June 7, 2010, based on his inability to perform the ADLs of, among other things, bathing, transferring, and dressing.

5. <u>Mr. Zonta</u>

Mr. Zonta initially filed for TSGLI benefits on May 8, 2009, claiming an inability to perform ADLs following an injury in a motorcycle accident (but not an accident involving traumatic brain injury).  He was hospitalized and underwent surgery for a fracture of his right feumr and facial injuries.  Mr. Zonta's application claimed an inability to perform various ADLs from June 26, 2007 through August 30, 2007, a period of 64 days.  On May 26, 2009, the Army approved Mr. Zonta's claim and paid him TSGLI benefits based on an inability to perform ADLs for a period of 60 continuous days.

On May 11, 2011, Mr. Zonta re-applied[11] for TSGLI benefits resulting from that same accident, stating that "I also received home health care and had an RN come to my house to take care of ADLs until Nov. 10, 2007," a period that would extend his TSGLI benefits to the maximum amount, reflecting the inability to perform ADLs for a period of 120 or more consecutive days.   The medical certification for this (re-)application was completed by DR. Robert Agawad, based on Dr. Agawad's review of Mr. Zonta's medical records.  Dr. Agawad

---

[11]     The Army does not appear to  take issue with Mr. Zonta applying for additional benefits or contend that his prior application precludes him from re-asserting a broader claim.  Thus, the Court will evaluate the re-application as if it were Mr. Zonta's first and only application, mindful of the fact that Mr. Zonta has already been approved for benefits for the first 60 days of the period claimed.
      Mr. Zonta argues that he "was paid under a separate section of the TSGLI guidelines," but offers no citation or support for this contention.

stated that Mr. Zonta was unable to perform the ADLs of dressing, eating, toileting, and

transferring from June 25, 2007 to November 10, 2007.  Dr. Agawad did not elaborate on the

nature of such limitations, instead directing the reader, "please see attached document for

description of injuries and home health care."  The referenced document consists of a two-page

"diary," listing the 10-week period from July 23, 2007 to October 10, 2007.  For each week, the

(unspecified) author of the diary – apparently Kristen Olsen, a registered nurse[12]  -- lists the

services that she performed for Mr. Zonta on various days.  For example, for "Week 2 (July 29th

– Aug 4th)," the author states that on "Monday-Thursday" of that week, she "gave Johnny a bath

each day; helped with physical therapy exercises; brought lasagna for dinner one night; [and]

helped him change into clothing."  The subsequent document in the record is a letter from Ms.

Olsen that reads as follows:

> I knew John Zonta for 3 years prior to his accident and when he
> needed me I was more than happy to donate my time to aid in his
> recovery.  I was there to help him with his bathing, exercises,
> dinner, bathroom duties, house cleaning and laundry.  I wasn't able
> to be there every day but he had family and other friends that
> helped with other things that he needed.  His wife at the time was a
> RN as well and lived in Eau Claire, WI.  When she was in town
> she took care of him and did all these duties on her days off.  His
> best friend quit his job with the airlines and move back from
> Detroit MI to live with him and take care of him during the times
> that nobody was around.  If it wasn't for the three of us he would
> have definitely needed to live in an adult care facility.

The record indicates that Mr. Zonta's application for additional benefits was submitted to the

TSGLI office's staff physician for review.  The physician noted that "There is evidence of home

---

[12]      The copy of the diary attached to Mr. Zonta's claim is unsigned and unadorned by any
explanatory text or indication of the author.  However, there are other copies of the diary in the
record that bear Ms. Olsen's handwritten signature at the bottom.   The Court will thus assume
that Ms. Olsen is the author of the diary and claims to have delivered the services stated therein.

health nursing, but no record of continuance of this service beyond 30 days.  There is no evidence of complications of care or healing."  Thus, the physician recommended that Mr. Zonta's claim for benefits beyond 90 days be denied, and the Army followed that recommendation.

The Court begins its review of Mr. Zonta's claim with the recognition that he received benefits reflecting 60 days of continuous inability to perform ADLs, beginning on June 26, 2007. He would be entitled to additional benefits beyond that amount if his inability to perform ADLs extended to the 90th consecutive day, namely September 24, 2007.  38 C.F.R. § 9.20(f)(20). Thus, the Court turns to the record of Mr. Zonta's needs as they existed on or about September 24, 2007.  The diary's author claims that in the week of September 24 ("Week 8"), she assisted him with the ADLs of showering and dressing on Monday through Wednesday of that week; the following week, she assisted him with bathing and dressing Tuesday through Friday; and on the final week listed in the diary, she assisted him with showering on Monday through Wednesday.

The diary and Ms. Olsen's statements are not corroborated by any particular medical evidence regarding Mr. Zonta's condition at this time.  Indeed, the medical records indicate that Mr. Zonta received home health care through an agency called Home Health United through July 25, 2007, but that such care was discontinued on the direction of Mr. Zonta's physician because Mr. Zonta's "goals were met" and he was "not homebound."  (This fact appears on a discharge record from Home Health United; the record does not include any particular physician's note or instruction that would confirm this representation.)  There are relatively few medical records addressing Mr. Zonta's status between July 25, 2007 and November 27, 2007, and what records that do exist are not entirely consistent.  For example, page 324 in the record indicates that Mr.

Zonta went to the Emergency Room at Sacred Heart Hospital in Eau Claire, WI, on October 9, 2007, complaining of gastric distress. He was admitted to the hospital on that date and discharged on October 11. The discharge note indicates that he "is going to stay in a local hotel. He has been up visiting family here and apparently stays in a hotel when he does that." However, according to the diary, the author was providing services to Mr. Zonta on "Monday-Wednesday" of this week,[13] a time frame that includes dates on which Mr. Zonta was admitted to Sacred Heart Hospital and the date that he was discharged to stay in a local hotel. Thus, in this respect, the diary's contents are apparently contradicted by the medical record.

This, ultimately, puts Mr. Zonta's amended claim on a different footing than Mr. Andersonn's. Although both claimants' records appear to include the statement of a percipient witness who claimed to deliver ADL services to the claimant during the claim period, the witness' statement in Mr. Zonta's case is affirmatively contradicted by the medical record itself. The Court does not opine as to the reason for this disparity; it is enough to observe that, due to conflicting evidence in the record as to the reliability of the diary, the Army did not act arbitrarily or capriciously in choosing to not credit the diary. Ms. Olsen's narrative statement, although professing to have delivered ADL services to Mr. Zonta, does not contain any clear

---

[13]     Ascertaining precisely what days the diary's author allegedly provided services to Mr. Zonta is complicated by the fact that the services are identified as having been provided on specific days (*e.g.* "Monday – Wednesday") of a given week, but the author sometimes defines those weeks in an unorthodox way. The first "week" listed identifies only a Monday-Friday period. Subsequent "weeks" first begin on Sundays, but the diary's author sometimes defines a given "week" to be an 8-day period, which pushes the start of the next "week" further along the calendar. By "Week 8" of the diary, the week begins on a Tuesday, which makes it difficult to determine what the diary's author means when the diary states that she provided services to Mr. Zonta from "Monday-Wednesday" of that week -- Wednesday was the second day of that week and Monday was the second-to-last day.

Moreover, the time period from August 20 to August 25 is left out of the diary entirely.

indication of the time frame that it refers to, and thus, the Army similarly could reasonably have concluded that the narrative statement did not advance Mr. Zonta's claim further.  Moreover, the record indicated that Mr. Zonta was no longer housebound as of July 25, 2007, when Home Health United's services were discharged, and thus, the Army could reasonably conclude that Mr. Zonta had thus sufficiently recovered from his injuries to permit him to resume independent performance of his ADLs.

Accordingly, the Court affirms the Army's decision to deny Mr. Zonta's amended claim.

6.      Ms. Truax

Ms. Truax applied for TSGLI benefits on March 30, 2011.  Like Mr. Andersonn, she cited an injury date that was significantly removed from the onset of the inability to perform ADLs.  In Ms. Truax's case, she cited an injury in October 2009 when she bumped into a countertop while walking in a dark room, suffering an injury to her hip.  However, according to her application, the inability to perform ADLs is connected to a surgery she had on her hip on February 14, 2011.  Ms. Truax's medical certification is by Matthew Heinrich, an orthopedic surgeon who indicates that he personally observed her inability to perform the ADLs. Dr. Heinrich indicates that Ms. Truax was unable to perform the ADLs of bathing and using the toilet, from the February 14 surgery until March 14, 2011 (a 28-day period), and was unable to perform the ADLs of dressing and transferring, with an onset date of January 10, 2011 and a resolution date of March 31, 2011 (an 80-day period).  However, the Army points out that Mr. Heinrich's certification is dated March 11, 2011, calling into question his ability to certify that Ms. Truax was unable to perform the ADLs until a date certain in the future.

According to the record, the Army denied Ms. Truax's claim on the grounds that her injury was not the result of a traumatic event.[14]  38 C.R.F. § 9.20(b)(1) defines a "traumatic event" as "the application of external force," and the Army concluded that Ms. Truax bumping into the countertop did not involve such "external force."  Ms. Truax sought reconsideration of the denial, arguing that the injury resulted from "impact" with the countertop, but the Army upheld the denial.

Thus, the question on Ms. Truax's claim is whether bumping into a solid object while walking constitutes a "the application of external force" for purposes on § 9.20(b)(1).  There is nothing in the record or the parties' briefs that offers any particular guidance on the definition of the term "external force."  The Court notes that Mr. Andersonn's injury – hurting his knee due to an inartful landing after jumping off an obstacle -- is at least conceptually similar to Ms. Truax's, insofar as there was not a separate causal agent involved (*e.g.* another motorist, a projectile, etc.).  Since the Army did not reject Mr. Andersonn's claim on the grounds that his injury was not the result of a traumatic event, the Court will assume that the Army draws some distinction between the two sets of circumstances.  It would seem to the Court that the distinguishing characteristic must necessarily be height (or its partner, gravity).  In other words, Mr. Andersonn's injury was the result of him jumping from a height, with gravity being the "external force" that accelerated

---

[14]     Curiously, the Army's brief argues that Ms. Truax's claim was properly denied due to her failure to show that she suffered an inability to perform ADLs over a 30-day period.  The Army relegates the "traumatic injury" argument to a footnote.  However, in conducting an APA review, the Court "may affirm an agency's decision only on the grounds articulated by the agency itself," not based on an "after-the-fact rationalization by counsel in briefs or argument."  *Olenhouse*, 42 F.3d at 1565.  Accordingly, the Court limits its review of the evidence supporting the Army's conclusion to that addressing the "no traumatic event" explanation given in Ms. Truax's denial letter.

his movement and caused him to suffer the injury upon impact. *See also* Mr. Melson, *infra.* Ms. Truax, on the other hand, was simply walking – motivated by her own internal force – when her impact occurred; that is, her impact with the countertop was not attributable, in whole or part, to Ms. Truax being accelerated beyond her normal walking speed by some external force (*e.g.* sliding on a wet floor, or tripping and falling forward into the countertop, or being pushed by another person).

Although the distinction is somewhat abstract, the Court cannot say that the Army's construction of the phrase "application of external force" in this situation is arbitrary or capricious. Ms. Truax does not point the Court to evidence that the Army has approved TSGLI claims in other contexts where claimants were injured walking into objects, thus indicating that the Army's interpretation of that phrase is inconsistent with past practice. Nor does the Court find it unreasonable for the Army to construe the statutory and regulatory language in such a way as to exclude coverage for injuries suffered as the result of simple carelessness by the claimant. Accordingly, the Court cannot say that the Army's denial of Ms. Truax's claim was arbitrary or capricious.

### 7. Mr. Melson

Mr. Melson applied for TSGLI benefits on July 20, 2011, citing an injury he sustained on December 1, 2001, when he fell down some stairs and struck a metal pole. He underwent surgery to repair a clavicle fracture. His medical certification, signed by nurse practitioner Christine Maggi (and based upon her review of his medical records in 2011), indicated that Mr. Melson was unable to perform the ADLs of bathing, dressing, toileting, and transferring, from December 1, 2001 to May 1, 2002. The record on Mr. Melson's claim includes a statement

signed by his wife, attesting to the fact that she "had to give him physical assistance in changing

clothes . . . in sitting in a chair and moving to a bed . . [and] in removing clothing and sitting on a

toilet," among other things.  She states that she "continued giving my husband physical and

stand-by assistance for ADLs until May 2002."  The Army denied Mr. Melson's claim on the

ground that the medical information did not support the claimed limitations.[15]

The medical record regarding Mr. Melson is quite limited.  There are several handwritten

doctor's notes from follow-up consultations, but the handwriting is illegible or the comments so

cursory as to be unenlightening. At best, there is an indication on March 4, 2002 that Mr. Melson

is "doing well" with a decrease in pain reported, such that his physician saw fit to prescribe the

beginning of a physical therapy regimen, but nothing else in the record elaborates on the course

of Mr. Melson's recovery.  In such circumstances, as with Mr. Andersonn, the unrebutted

statement from Mr. Melson's wife is dispositive.  Although Mr. Melson's own doctors do not

comment upon his need for assistance in ADLs, they do not _refute_ that such assistance is

necessary either; the record is simply silent on that point.  Unlike Mr. Zonta's situation, the

Court sees nothing in Mr. Melson's medical records that affirmatively disputes the

representations as to the type or duration of assistance that Mr. Melson's wife claims to have

provided.  Thus, Mr. Melson's wife's statement stands unrebutted and serves as conclusive proof

that Mr. Melson did indeed require the assistance described.

Accordingly, the Court finds that the Army's denial of Mr. Melson's claim was arbitrary

and capricious.  The Court sets aside that denial and directs the Army to certify that Mr. Melson

---

[15]     Once again, the Court limits its analysis to the Army's stated reasons for denying the
claim, and does not consider collateral issues, such as the timeliness of Mr. Melson's claim or
the significance of his 2003 discharge from service.

was eligible for benefits based on his inability to perform two or more ADLs from December 1, 2001 to May 1, 2002.

8. <u>Mr. Philbrick</u>

Mr. Philbrick applied for benefits on April 7, 2010, citing to a September 15, 2009 injury in which he was struck by a bullet in the upper back while supervising a firing range.  He was hospitalized for a period of 21 days in a medically-induced coma and suffered an anoxic brain injury.  His medical provider, John Gottschalk, filed a certification based on his review of Mr. Philbrick's medical records, finding that Mr. Philbrick was limited in his ability to perform the ADLs of bathing through November 10, 2009 (57 days), dressing through December 15, 2009 (92 days), and toileting and transferring through November 1, 2009 (48 days).

The Army concluded that Mr. Philbrick had suffered a traumatic brain injury, making him eligible for TSGLI benefits once his inability to perform two ADLs extended for 15, 30, 60, or 90 consecutive days.  38 C.R.F. § 9.20(f)(17).  The Army concluded that Mr. Philbrick had shown an inability to perform multiple ADLs for as long as 56 days, but he had not demonstrated that his ability to perform at least <u>two</u> of those ADLs remained impaired through the 60- or 90-day thresholds, the inability to bathe independently being the only impairment that lasted beyond 57 days.  Thus, the Army certified him for benefits payable based on the 30 days of impairment threshold.

Mr. Philbrick's substantive response consists of a single, unclear sentence: "The Army's characterization of Philbrick's periods of limitation are contradicted by the lengths of time noted in its motion."  It is not clear whether Mr. Philbrick is disputing the Army's calculation of the number of days in each period identified by Mr. Gottschalk (suggesting that the Government's

counsel here has miscalculated), or that some other error has occurred. The Court has independently reviewed Mr. Gottschalk's certification and calculated the days applicable to each period, and finds that the Army's conclusion is consistent with Mr. Philbrick's application. Accordingly, the Court affirms the Army's decision to certify Mr. Philbrick for 30 days of impairment due to a traumatic brain injury, but no more.

        9. <u>Mr. Zilmer</u>

Mr. Zilmer applied for benefits on August 19, 2011, citing a gunshot wound to his foot suffered on February 17, 2011, during combat operations.  His application was certified by registered nurse Joshua Anderson, although Mr. Anderson did not check either box indicating whether he was personally familiar with Mr. Zilmer's limitations or whether he simply reviewed records.  Mr. Anderson stated that Mr. Zilmer "partially amputated his third toe" and was medically evacuated, subsequently undergoing several surgeries over 10 weeks."  He certified that Mr. Zilmer was limited in his ability to bathe, toilet, transfer, and dress from February 17, 2011 to April 28, 2011.  (Mr. Anderson gave May 28, 2011 as the end date for Mr. Zilmer's inability to transfer, due to surgeries that affected his ability to put weight on his foot.)

The Army denied Mr. Zilmer's claim on the grounds that Mr. Anderson did not purport to have personally witnessed Mr. Zilmer's limitations and that Mr. Zilmer did not submit sufficient corroborating medical records.  The entirety of the medical records supporting Mr. Zilmer's claims consist of two "Patient Movement Request" forms, both generated on February 23, 2011, seeking to move Mr. Zilmer from one location to another.  The forms themselves are mutually-inconsistent: one indicates that Mr. Zilmer is "able to egress aircraft without assistance

and will not need assistance to manage baggage," and the other form indicates that Mr. Zilmer "cannot self-egress" and "assistance with bags needed."

As has been noted previously, the Court cannot say that it is arbitrary or capricious of the Army to require that medical provider certifications based solely on the provider's review of medical records be supported by evidence in the medical records that corroborates the claimed inability to perform ADLs.  Here, there is no clear indication that Mr. Anderson personally witnessed Mr. Zilmer's ADLs, and thus, the Army properly turned to the medical record to ascertain whether Mr. Anderson's conclusions were consistent.  Mr. Zilmer's medical record is so meager that the Army found no such corroboration therein.  This Court cannot say that it was arbitrary or capricious of the Army to conclude that the record was insufficient to support Mr. Anderson's conclusions.

Mr. Zilmer's brief argues that "one moved halfway across the world doesn't have the treating physician available to sign documents," but this argument does little to advance the claim.  Mr. Zilmer is not required to produce documentation from his "treating physician," but he is required to produce a sufficiently complete medical record to support his claim.  Mr. Zilmer could certainly have delayed filing his claim until he could gather the necessary records or otherwise document his inability to perform ADLs in other ways.  Accordingly, the Court affirms the Army's denial of TSGLI benefits.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** each side's Motion for Summary Judgment (**# 30, 34**).  The Court **AFFIRMS** the Army's decision to deny benefits (or additional benefits) to Mr. Fail, Mr. Buccholz, Mr. Zonta, Ms. Truax, Mr.

Philbrick, and Mr. Zilmer.  The Court finds that the Army's decisions to deny benefits to Mr.

Andersonn and Mr. Melson were arbitrary and capricious, and therefore **VACATES** those

decisions, directing the Army to certify the eligibility of Mr. Andersonn and Mr. Melson for

benefits as set forth herein.  The Court having resolved all matters pending herein, the Clerk of

the Court shall close this case.

     Dated this 27th day of September, 2013.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge